UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>v.<br><br>CRISTOBAL PALOMINO,<br><br>   Defendant. | Case No. 2:23-cv-00338-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Cristobal Palomino's Motion to Suppress. Dkt. 33. The Court held an evidentiary hearing on October 29, 2024, and took the matter under advisement. For the reasons set forth below, the Motion to Suppress is DENIED.

## II. BACKGROUND

On October 21, 2023, Shoshone County Sherriff's Deputy N. Abshire received a report of an erratic driver in a back Cadillac who had struck multiple construction cones and another car. Dkt. 33-1, at 1.[1] Dispatch informed Abshire that the reporting party was following the Cadillac in a white cargo van. Abshire positioned his patrol vehicle about eight miles down the interstate and began following the Cadillac when it passed by. *Id.* After following the Cadillac for about a quarter of a mile and witnessing it swerve within its lane, Abshire activated his emergency lights to pull the vehicle over. *Id.*

---

[1] Page citations are to the CM/ECF-generated page number.

MEMORANDUM DECISION AND ORDER - 1

The driver of the vehicle, Defendant Cristobal Palomino, did not immediately stop. *Id.* Instead, he took the next off ramp where Officer Dameon Groves—of the Kellogg Police Department—was waiting with his emergency lights on. *Id.* Groves pulled in front of the Cadillac, and Palomino stopped, partially blocking the roadway. *Id.* Abshire then exited his vehicle and, upon approaching the Cadillac, ordered Palomino to exit the car. Dkt. 38, Ex. A *Abshire* at 00:00. Palomino had opened his door, and Abshire ordered him out of the car four times before Palomino asked if he could grab his phone. *Id.* at 00:07. After Abshire responded that he could not grab his phone, Palomino exited his car and began walking towards Abshire. *Id.* at 00:16.

Palomino was wearing a bulky sweatshirt and loose-fitting blue jeans. *Id.* Abshire told Palomino to keep walking towards the back of the Cadillac, directed him to place his hands on the vehicle, and questioned whether he had any weapons on him. *Id.* at 00:22. Palomino did not initially respond to Abshire's question. Abshire had to tell Palomino to place his hands on the vehicle twice before he complied, and Palomino only did so once Groves grabbed his hand and helped him. *Id.* at 00:28. Abshire then told Palomino that he would be conducting a weapons pat-down and again asked if he had any weapons on him. *Id.* at 00:37. Palomino attempted to move his right hand to his right-side pocket, and indicated he had a pocketknife, but Abshire instructed him to return his hand to the vehicle. Dkt. 38, Ex. A *Abshire* at 00:40.

Groves placed Palomino's hands behind his back, and Abshire informed Palomino he was being detained. *Id.* at 00:55. Groves then asked Palomino if he could "take the stuff out of his pockets," and Palomino responded "yeah." *Id.* at 01:13. Groves then removed,

MEMORANDUM DECISION AND ORDER - 2

from the front-right pocket of Palomino's jeans, several handfuls of items which included a pocketknife, scissors, and a small baggie with a green leafy substance (in that order), which officers recognized as marijuana.[2] *Id*. at 01:25. Palomino continued to ask for his phone and to smoke a cigarette. *Id*. at 02:04. After removing all the items from Palomino's pockets, Groves asked Palomino whether he understood English (to which Palomino answered in the affirmative), gave Palomino his *Miranda* warnings, and asked him if he understood those rights. *Id*. at 03:31. Palomino responded, "yeah," and Groves next asked him if the marijuana found in his pocket was his. *Id*. at 03:52–04:06. Palomino replied, "Yeah, but I wanna smoke a cigarette." *Id*.

Groves then asked Palomino if he had a driver's license or passport, and Palomino indicated his passport was in the car. Dkt. 38, Ex. A *Abshire* at 04:22. The officers asked Palomino where the passport was in the car and if it was okay for them to go grab it, and, after indicating the officers could, Palomino kept asking if he could show them where the passport was or get his phone. *Id*. at 04:28. Officer Crawford from the Kellogg Police Department had previously arrived on the scene, and he ultimately entered the vehicle and removed the passport when Palomino eventually indicated that it was on the passenger seat. *Id*. at 04:49. According to Abshire, Palomino became increasingly agitated as Crawford approached the vehicle. Dkt. 33-1, at 2; Dkt. 38, Ex. A *Abshire* at 04:55.

As Crawford provided Palomino's identification information to dispatch, Abshire began questioning Palomino about his erratic driving. Dkt. 33-1, at 2–3; Dkt. 38, Ex. A

---

[2] Possession of any amount of marijuana is illegal in Idaho. Idaho Code § 37-2705(d)(22).

MEMORANDUM DECISION AND ORDER - 3

*Abshire* at 05:50. Palomino confirmed that he had hit a construction cone on the highway and claimed he did so because he had fallen asleep. Dkt. 38, Ex. A *Abshire* at 06:02. When questioned, Palomino denied hitting another vehicle but did concede he made the driver of the other vehicle "hit the E-brake." Dkt. 38, Ex. A *Abshire* at 08:30.

Abshire then pulled Crawford aside to speak privately, and asked Crawford whether he had smelled anything when he had reached into Palomino's car to retrieve the passport. *Id*. at 09:42–9:53. Crawford initially responded that he didn't smell anything but then said, "I mean, old, like it smells like somebody has smoked in there, but it was like old." *Id*. at 09:53.

Abshire returned to Palomino and asked him, "when was the last time you smoked?" *Id*. at 10:15. Palomino claimed the last time he had smoked marijuana was two nights prior and repeatedly stated there was nothing illegal in his vehicle. *Id*. at 10:27–13:14. During the questioning, Abshire observed Palomino swaying back and forth, avoiding eye contact, and pausing for extended amounts of time before answering.[3] Dkt. 33-1, at 3. After questioning, Palomino was informed he was under arrest for possession of marijuana and was placed in the back of Abshire's vehicle. *Id.*; Dkt. 38, Ex. A *Abshire* at 15:00.

Abshire then began searching Palomino's vehicle, and, in doing so, smelled marijuana. Dkt. 33-1, at 3. Abshire opened the center console of the car and encountered a large brick of circular blue pills inside clear plastic wrapping and strips of duct tape. *Id.*;

---

[3] During the evidentiary hearing, Groves testified that Palomino understood and responded appropriately to several questions, he did not appear to be impaired, and there was nothing to indicate he didn't understand what the officers were saying.


Dkt. 38, Ex. A *Abshire* at 20:30. The pills had an "M" on one side and a "30" on the other, which Abshire recognized as fentanyl. Dkt. 33-1, at 3. In the upper portion of the center console, Abshire found a clear glass smoking device with burnt residue inside and loose buds of what he recognized as marijuana. *Id.*; Dkt. 38, Ex. A *Abshire* at 26:00.

After the search, Abshire removed Palomino from the police vehicle, and Palomino began pacing back and forth while crying and ultimately resting his head against Abshire's vehicle. Dkt. 33-1, at 3. Abshire asked Palomino if he was being forced to deliver the pills or if he was doing so for monetary gain. *Id.* Palomino then claimed that he had picked up a girl at a gas station in Spokane, Washington so that she could show him where to get a haircut. *Id.* He claimed he got pulled over with the girl in the car for "supposed drug activity," and, as police were speaking to him, the girl put the pills in the center console before leaving the vehicle. *Id.*

Groves showed Palomino the pills, and Palomino claimed they were "perks."[4] Dkt. 33-1, at 4. When asked, Palomino suggested "it [seemed like]" the pills were the ones the girl placed in his car. *Id.* Abshire asked Palomino if the marijuana and glass smoking device were his, and Palomino answered affirmatively. *Id.* Palomino claimed the last time he had used the device was two days prior when he had smoked pills. *Id.* After further questioning, Palomino claimed he did not smoke "mexis,"[5] but that he did smoke meth. *Id.* Palomino was again placed in Abshire's car, along with the items secured in the search of

---

[4] Palomino's reference to "perks" appears to mean the pills were Percocet.

[5] The term "mexis" is slang for fentanyl. *Weekly Briefing*, National Drug Early Warning System (May 20, 2022), https://ndews.org/wordpress/files/2024/03/NDEWS-Weekly-Briefing-Issue-85.pdf.

MEMORANDUM DECISION AND ORDER - 5

his vehicle, and transported to the Shoshone public safety building. *Id.* Palomino was ultimately charged under 21 U.S.C. § 841(a)(1) and (b)(1)(C) with Possession with Intent to Distribute Fentanyl. Dkt. 2, at 1.

On August 27, 2024, Palomino filed the instant Motion to Suppress. Dkt. 33. Palomino argues officers violated the Fourth Amendment by unlawfully searching his person and vehicle without probable cause. The Government opposed Palomino's Motion to Suppress (Dkt. 36) and Palomino replied. Dkt. 38. As mentioned, the Court held an evidentiary hearing on October 29, 2024, and took the matter under advisement. Dkt. 40.

### III. LEGAL STANDARD

The Fourth Amendment guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643, 646 n.4 (1961) (quoting U.S. Const. amend IV). The Fourth Amendment "does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (9th Cir. 1991)). Consequently, the "touchstone" of a court's analysis under the Fourth Amendment "is always 'the reasonableness in all the circumstances of the particular government invasion of a citizen's personal security.'" *Pennsylvania v. Mimms*, 434 U.S. 106,108–109 (1977) (quoting *Terry*, *v. Ohio*, 392 U.S. 1, 19 (1968)). "[T]here is 'no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Terry*, 392 U.S. at 21.

Generally, searches and seizures conducted without a warrant are "per se unreasonable under the Fourth Amendment" subject to "a few specifically established and

well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) ("*Dickerson*") (cleaned up). Several exceptions to the warrant requirement are relevant in this case.

### A. *Terry* Stop

First, in *Terry*, the Supreme Court held that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," the officer may briefly stop the suspicious person and make "reasonable inquiries" aimed at confirming his suspicions. *Terry*, 392 U.S. at 30. In a traffic-stop context, it is reasonable for an officer to conclude that criminal activity may be afoot "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *Arizona v. Johnson*, 555 U.S. 323, 326 (2009). However, to proceed from a stop to a frisk, an officer must reasonably suspect that the person stopped is armed and dangerous. *Id.* at 326–27.

Once an officer reasonably believes that "criminal activity may be afoot," and that the persons involved may be armed and dangerous, he can pat down the outer surface of a suspect's clothing to determine whether the suspect has a weapon. 392 U.S. at 30. If the officer feels a weapon, he may reach for and remove the weapon. *Id.* If, during a pat-down search for weapons, an officer encounters something that he has probable cause to believe is contraband, he may seize it, even if the contraband is initially discovered through touch only. *Dickerson*, 508 U.S. at 376–77.

### B. Consent

A "search conducted pursuant to a valid consent is constitutionally permissible," even in the absence of a warrant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Such consent must be voluntary, considering the totality of the circumstances. *Id.* at 227. To analyze whether a defendant's consent was voluntary, courts consider several non-exclusive factors, including: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings had been given; (4) whether the defendant was told he had a right not to consent; and (5) whether the defendant was advised a search warrant could be obtained. *United States v. Furrow*, 229 F.3d 805, 813 (9th Cir. 2000) (*overruled on other grounds*, *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001)).

### C. Search Incident to Arrest

When an individual has been arrested, law enforcement may conduct a warrantless search of his person and of his surrounding area. *Chimel v. California*, 395 U.S. 752, 762–63 (1969). This includes the passenger compartment of an automobile and all containers within the compartment. *New York v. Belton*, 453 U.S. 454, 460–61 (1981). The goal of such searches is to both protect officers and bystanders, while also preventing the concealment or destruction of evidence. *Chimel*, 395 U.S. at 763.

### D. Fruit of the Poisonous Tree and Exceptions

In the absence of an exception to the exclusionary rule, evidence seized through an unreasonable search or seizure must be excluded. Further, evidence discovered through the "exploitation of" an unlawful search or seizure must also be suppressed as "fruit of the

poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence qualifies as "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (quoting *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980)). There are two exceptions to this doctrine that are relevant here, because the evidence in Palomino's car could potentially have been discovered under the automobile exception.

1. *Inevitable Discovery*

First, illegally obtained evidence may be introduced "if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means." *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). This exception, known as the inevitable discovery doctrine, requires "the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *United States v. Boatwright*, 822 F.2d 862, 864–65 (9th Cir. 1987).

2. *Independent Source*

Second, the "independent source" exception permits the admission of evidence that is "actually found by legal means through sources unrelated to the illegal search." *Ramirez-Sandoval*, 872 F.2d at 1396 (citing *Silverthorne Lumber Co. v. United States*, 25 U.S. 385, 392 (1920)). Evidence discovered through an independent source is not fruit of the poisonous tree because its discovery is not the result of an official's illegal conduct. *Ramirez-Sandoval*, 872 F.2d at 1396. The inevitable discovery and independent exceptions are closely linked to one another because both consider "whether the police would have

discovered the evidence if the misconduct had not occurred." *United States v. Namer*, 835 F.2d 1084, 1087 (5th Cir. 1988)).

      a. <u>Automobile Exception</u>

The automobile exception permits the warrantless search of a vehicle when the car is "readily mobile" and where "probable cause exists to believe it contains contraband." *United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir. 2008) (citation omitted). Even where a suspect has not been arrested, the police may search both an automobile and the containers within it "where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

### IV. ANALYSIS

In his Motion to Suppress, Palomino does not challenge either Abshire's initial stop of his vehicle, or Groves' pat-down search for the pocketknife that Palomino admitted was in his pocket. Instead, Palomino challenges both the seizure of the small baggie of marijuana contained in the same pocket as the knife and the subsequent search of his vehicle. Dkt. 33, at 10. Palomino raises three primary arguments: (1) the seizure of the bag of marijuana from his pocket exceeded the scope of a valid *Terry* search, (2) any consent Palomino gave to search his pockets was not voluntary, and (3) the search of the vehicle incident to arrest for possession was the "fruit of the poisonous tree," and the evidence gathered from the car must be suppressed. Dkt. 33, at 7–12. The Court addresses each contention in turn.

### A. Groves' search under *Terry*

Neither party contends the frisk of Palomino for weapons was improper, and the Court agrees. Due to the nature of the stop, Palomino's erratic behavior, and Palomino's admission that he had a knife in his front pocket, Groves had a reasonable belief that Palomino was armed—in fact he knew he was—and dangerous. The question then becomes whether grabbing the small plastic baggie from the same pocket as the knife exceeded the scope of the *Terry* frisk, making it unconstitutional.

Although the purpose of a *Terry* frisk is to search for weapons, an officer need not ignore contraband discovered during a valid *Terry* search.[6] That is, when an officer lawfully conducts a *Terry* search, and an item which the officer has probable cause to believe is contraband is found in the course of that search, the officer may seize that item as well. *See State v. Long*, 463 U.S. 1032, 1050 (1983) ("If, while conducting a legitimate *Terry* search of the interior of the automobile, the officer should, as here, discover contraband other than weapons, he clearly cannot be required to ignore the contraband…"); *see also Dickerson*, 508 U.S. at 376 ("…the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures.").

In *Dickerson*, an officer felt a small lump in a suspect's jacket while conducting a pat down, and, in manipulating the item, suspected it was crack cocaine wrapped in

---

[6] "The sole justification of the search in the present situations is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29.

MEMORANDUM DECISION AND ORDER - 11

cellophane. *Id.* at 369. The officer did not detect any weapons in the suspect's pocket, and he only suspected the item was crack cocaine after using his fingers on top of the jacket to slide it around. *Id.* The Court held the search and seizure violated the Fourth Amendment because the officer continued to explore the suspect's pocket after concluding there was no weapon inside, which was really an evidentiary search not concerned with the protection of the police. *Id.* at 378. Similarly, in *Sibron*, an officer searched the inside of a suspect's pockets with no initial pat down for weapons at all, which the Court found had no connection to officer safety and violated the Fourth Amendment. *Sibron v. New York*, 392 U.S. 40, 65 (1968).

Here, Groves' pat-down was unique because Groves appropriately reached into Palomino's pocket to retrieve the pocketknife Palomino admitted was inside. However, it does not automatically follow that retrieving the plastic baggie full of marijuana was also appropriate. After removing the knife from Palomino's pocket, Groves reached into the pocket three more times and continued to pull more items out, even though he had already removed the weapon, and the concern for officer safety had been mitigated.[7] Therefore, like in *Dickerson* and *Sibron*, it would be unconstitutional to continue to explore Palomino's pocket once Groves was assured there was no weapon.

The only alternative to support the seizure of the baggie of marijuana is if Groves

---

[7] Palomino's pockets were very full, containing multiple items that an officer, in conducting a *Terry* frisk, could reasonably suspect were weapons. This included scissors and even a chicken bone. The scissors were in the same pocket as the pocketknife and marijuana, but the items were removed in the following order: knife, scissors, marijuana. Dkt. 38, Ex. A *Abshire* at 01:25. As such, because the baggie was the last item to be removed from Palomino's pocket, the weapons could have been recovered without removing the baggie, and the analysis above still applies.

had independent probable cause, just through touching it, to suspect it was paraphernalia. The Court concludes Groves did not have the necessary probable cause. As defense counsel contends, just because the baggie was in the same pocket as the pocketknife, it does not automatically follow that the marijuana would have been discovered. And without further manipulation of the baggie such as that performed in *Dickerson*, it would be nearly impossible to determine the baggie contained marijuana just from feeling it in the pocket. The baggie could have contained a plethora of legal items, and it was not reasonable for Groves to automatically conclude it contained contraband, especially considering the large quantity of bizarre items pulled from Palomino's pockets.[8]

Because the *Terry* exception to the warrant requirement does not apply to the baggie located in Palomino's pocket, the Court next considers whether the baggie was nevertheless lawfully discovered because Palomino consented to the search of his pockets.

### B. Palomino's Consent to the Search of his Pockets

As discussed above in the legal standard section, the Court must consider several non-dispositive factors when assessing whether Palomino voluntarily consented to the warrantless search of his pockets. These include: (1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether *Miranda* warnings had been given; (4) whether the defendant was told he had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained. *United States v.*

---

[8] The standard for probable cause is flexible, but it requires that, from the facts available to an officer at the time, a reasonable person would believe that contraband or evidence of a crime is present. *Florida v. Harris*, 568 U.S. 237, 243 (2013) (citations omitted).

MEMORANDUM DECISION AND ORDER - 13

*Furrow*, 229 F.3d at 813.

In *Furrow*, the suspect was not threatened, the officers did not indicate that a search warrant was on the way, the suspect cooperated with police, and there were no threats from the arresting officers. The Ninth Circuit affirmed the district court's holding that the suspect's consent was voluntary based on such facts. *Id.* On the other hand, in *United States v. Washington*, an African American suspect was asked to exit his vehicle at night, during a time when racial tensions were high between officers and African Americans in the area. 490 F. 3d 765, 772 (9th Cir. 2007). After being directed to first exit his vehicle, and then to place his hands on the officers' vehicle and not to move or turn his head, the suspect was frisked. *Id*. *Id*. Even though no guns were drawn, the Ninth Circuit held the initially consensual search of the suspect escalated to an unlawful seizure whereby the suspect could do nothing more but comply with the officers' orders. *Id*. at 773.

By contrast, in *United States v. Torres-Sanchez*, the arresting officers did not give the suspect *Miranda* warnings, never informed him of his right to refuse a request for consent, and never explained a search warrant could be obtained. 83 F.3d 1123, 1130 (9th Cir. 1996). The suspect was not under arrest at the time consent was given, but he was placed in the back of the patrol car with an officer watching him *Id.* at 1126. The officer did not use any threats of force, unnecessary delays, or exaggerated displays of authority. *Id.* at 1129. Ultimately, the court held that consent was voluntary upon review of the totality of such circumstances. *Id.*

The circumstances at issue here are most similar to those in *Torres-Sanchez*. Specifically, Palomino was not given his *Miranda* warnings until after the search of his

MEMORANDUM DECISION AND ORDER - 14

pockets, but there was no custodial interrogation prior to that time that would have warranted such warnings. Although officers asked Palomino to exit his vehicle, they never contended they would obtain a warrant if he did not consent to the search of his person. Nor did they draw their guns, make an excessive show of authority, or issue any threats. While the Court recognizes that Palomino was detained for a traffic stop and that a reasonable person would not feel free to leave, *Torres-Sanchez* illustrates such circumstances do not alone make Palomino's consent involuntary. There are no special circumstances like those in *Washington* which would warrant a finding of involuntariness. For these reasons, the Court holds that Palomino's consent was voluntary.

In his briefing and during the evidentiary hearing, Palomino repeatedly emphasized that he was unable to knowingly consent to the search of his pockets because he is of low-level intelligence, and there were clear barriers in communication between him and the officers. In particular, he referenced two cases, *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998) and *United States v. Robles-Ramirez*, 93 F. Supp. 2d 762 (W.D. Tex. Apr. 6, 2000), to show that a person with an extreme lack of education, mental disabilities, or difficulties in understanding cannot voluntarily consent to a search.

*Garibay* and *Robles-Ramirez* are not particularly helpful here. First, both apply to defendants who consented to a waiver of their *Miranda* rights, and not to a search. As recognized in *Schneckloth*, consent searches do not possess the same inherently coercive characteristics of custodial interrogations, so there is "no reason to reject the traditional test for determining the voluntariness of a person's response" when they consent to a search. 412 U.S. at 247.

MEMORANDUM DECISION AND ORDER - 15

Second, in both *Garibay* and *Robles-Ramirez*, there was much more extensive evidence that the defendants could not comprehend what the officers were asking than there is with Palomino. In *Garibay*, the defendant had little comprehension of the English language and his IQ was very low. 143 F.3d at 538. In *Robles-Ramirez*, the defendant could not read, was unfamiliar with key words contained in his transcribed written statement, and was mentally disabled. 93 F. Supp. 2d at 767.

Here, however, the body camera footage illustrates Palomino persistently maintained that he understood what the officers were saying. In response to questions, Palomino's answers were sparse but relevant to the questions asked. He did not appear to be impaired, and while he was focused on getting his phone and a cigarette, any difficulties he was facing in comprehension or mental capability were not even remotely close to the impairments the defendants faced in *Garibay* and *Robles-Ramirez*. As part of his motion to suppress, Palomino provided elementary school records indicating that he struggled in school when he was young, but he progressed over time. Dkt. 34. He lacked educational support at home (leading to very poor attendance) and had a short attention span, but as of October 25, 2000, he had no diagnosed disability. *Id.* at 20. As the Government pointed out during oral arguments, the usefulness of these records is limited because they pertain to Palomino's mental capabilities as of 25-years ago. Additionally, these records and their contents were not known to the police at the time of the search.

On the day of the search, Palomino responded to officers' commands, albeit

MEMORANDUM DECISION AND ORDER - 16

hesitantly, and he answered their questions coherently.[9] When Groves asked if he could remove the items from his pockets, Palomino responded with a straightforward, "Yeah." While the detention and situation might have been stressful, Palomino was very hesitant to let officers enter his car to get his passport, and he kept saying he would go in and get it. This shows that he was not simply following every command the officers gave him, nor only saying yes to the search of his pockets in an act of compliance. If that were the case, he would have done the same when officers asked to enter his car.

The Court is even more persuaded by the lengthy story Palomino gave to officers when explaining where the pills found in his car came from. Not the veracity of the story, which may or may not have been true, but the fact that he could communicate clearly, he responded directly to the question asked of him, and his story was detailed and in depth. This, combined with the evidence referenced above, shows Palomino's consent to the search of his pockets was knowing and voluntary. Therefore, the baggie discovered as a result of such consent was lawfully discovered.

Because Palomino gave officers valid consent to search his pockets, the marijuana in his pocket was lawfully discovered, he was appropriately arrested for the possession of contraband, and the officers properly conducted a search incident to arrest of Palomino's car, thereby discovering the drugs and paraphernalia in the glove compartment. As such,

---

[9] Whether an officer reasonably believes a person has *authority* to consent to a search is based on the facts available to an officer in the moment. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). Based on Palomino's responsive behavior, and the fact the officers did not believe he was impaired, the facts available to them in the moment indicated Palomino could consent to a search. They could not have known that Palomino had previously faced difficulties in schooling, and so it was reasonable for them to believe he could knowingly consent to a search.

the officers' search of the Palomino's vehicle complied with the Fourth Amendment, and Palomino's Motion to Suppress is DENIED.

### C. Fruit of the Poisonous Tree and Possible Exceptions

Palomino argues that he was only arrested for possession of marijuana based on the illegal search of his person beyond the permitted scope of *Terry*, but he also concedes the search of the interior of his vehicle would have been proper if the original search leading to the discovery of the marijuana was constitutional (as a search incident to arrest). Dkt. 33, at 10. Similarly, the Government maintains the original search of Palomino's pocket was constitutional, and the subsequent search of the vehicle is justified as a search incident to arrest for possession. Dkt. 36, at 8. Because the Court has already held that the seizure of the marijuana from Palomino's pocket was constitutional, the glass smoking device, pills, and marijuana seized during the search of the vehicle incident to Palomino's arrest for possession are *not* fruit of the poisonous tree and should not be suppressed.

Even if the Court had held differently, the Government has argued that the baggie would have inevitably been discovered through either "plain smell" or during a search incident to arrest. *Id*. While the Government only briefly touched on this at both the evidentiary hearing and in its brief, the Court will briefly analyze these arguments as they could apply in this situation. Palomino contends the officers lacked probable cause to search under the automobile exception since the stale smell of marijuana in the car does not establish probable cause, particularly because Palomino was coming from Washington (where Marijuana is legal), so there was no indication that illegal activity was taking place. Dkt. 38, 7–8. It is a close

call in this case as to whether the smell of marijuana in the car established probable cause. On the bodycam footage, Crawford stated the smell of marijuana was old, but Abshire indicated in his report that he smelled marijuana, and Groves testified that he smelled marijuana as well. Both Abshire and Groves interacted more closely, and for an extended period of time, with Palomino, including conducting the search of the car, so it is likely that their accounts would be more accurate. And because officers who come close to a vehicle and detect a distinct odor of marijuana have probable cause to believe a vehicle contains contraband, *United States v. Johns*, 469 U.S. 478, 482 (1985), such probable cause existed here such that—even if officers had not obtained valid consent to search Palomino's pockets—they would have inevitably discovered the evidence in his car when they smelled marijuana and thus could search the vehicle under the automobile exception to the warrant requirement.

## V. CONCLUSION

Groves' seizure of the baggie of marijuana from Palomino's pocket exceeded the scope of the *Terry* frisk, but Palomino voluntarily gave his consent to the search of his pockets, making the search of his pockets constitutional. As such, the drugs and paraphernalia discovered in Palomino's car in a search incident to arrest are not fruit of the poisonous tree. In the alternative, the evidence in Palomino's car would have been inevitably discovered under the automobile exception, even if the search of Palomino's pockets was unconstitutional. Accordingly, none of the evidence discovered in Palomino's car or on his person will be suppressed.

## VI. ORDER

The Court **HEREBY ORDERS**:

1. Defendant Cristobal Palomino's Motion to Suppress (Dkt. 33) is **DENIED**.

DATED: November 26, 2024

_____
David C. Nye
Chief U.S. District Court Judge